UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | |
|---|---|
| SARCO CREEK RANCH, *et al*, § | |
| § | |
| Plaintiff, § | |
| VS. § | CIVIL ACTION NO. 6:14-CV-13 |
| § | |
| MILTON GREESON, *et al*, § | |
| § | |
| Defendants. § | |

# **MEMORANDUM AND ORDER**

Sarco Creek is an unassuming stream that runs intermittently through coastal prairie terrain in southern Goliad County. Two ranches along the stream call themselves—not surprisingly—"Sarco Creek Ranch." Plaintiff is the only one with a trademark for "Sarco Creek Ranch" and seeks a preliminary injunction to enforce the exclusive right to that name that a valid trademark would bestow. Defendants argue, however, that the trademark is invalid because "Sarco Creek" is primarily geographically descriptive.

In naming the ranches after the place where they are located, the parties demonstrate the durability of an observation the Supreme Court made almost 150 years ago: "Nothing is more common than that a manufacturer sends his products to market, designating them by the name of the place where they were made." *Canal Co. v. Clarke*, 80 U.S. 311, 325 (1872). But when a business name primarily signifies the place where the business is located, it does not connote to

1

consumers the particular business associated with the good and thus is not deserving of trademark protection.

A name may, however, be geographically descriptive but not primarily so. An example is when the place is so obscure that consumers would not associate the manufacturer's goods with the unknown place where those goods came from. In those situations, the name would instead evoke an association with the particular business, entitling it to trademark protection. Plaintiff hangs his hat on this argument, contending that the area surrounding Sarco Creek is essentially a "ghost town" and thus too obscure to create a name-place association. That is the primary question the Court must answer in deciding whether a preliminary injunction should issue.

I.  **BACKGROUND**

The facts recited below are undisputed. Plaintiff William Parmley[1] operates a 200-acre ranch called Sarco Creek Ranch in Goliad County. It first opened in 1959, Docket Entry No. 34-3 at 82, and from then to the present, Parmley has sold special Appaloosa horses under the Sarco Creek Ranch name. Although selling thoroughbreds is his specialty, *id.*, Parmley also sells hay, cattle, and other agricultural products, *id.* at 83.

---

[1] Sarco Creek Ranch LLC, operated by Parmley after he organized it under Texas law in 2010, is also a plaintiff in this suit. Docket Entry No. 34-3 ¶ 5.

Defendants Milton Greeson and Bridey Greeson[2] also operate a Sarco Creek Ranch in Goliad County. It is about ten miles north of Parmley's ranch on the creek and covers roughly 5,520 acres. The Greesons provide exclusive, high-quality hunting services, *see* Docket Entry No. 39-23, and sell cattle; they do not sell Appaloosa horses.

Although new to this Court, this has been a long running dispute. Parmley obtained federal and state service mark registrations for the "Sarco Creek Ranch" mark in 2008 and 2009. In January 2009, Parmley learned of the Greesons' ranch, and was troubled that people in Victoria were confused about which Sarco Creek Ranch was his and which one was theirs.[3] Docket Entry No. 34-3 at 83. In June 2009, Parmley sent the Greesons a cease-and-desist letter. They did not comply. Instead, in 2011, after Parmley refused to voluntarily surrender his registrations, they initiated cancellation proceedings in the Trademark Trial and Appeal Board (TTAB) of the United States Patent and Trademark Office, arguing that Parmley's federal registration of the mark "Sarco Creek Ranch" is invalid because it is primarily geographically descriptive. The TTAB denied Parmley's motion for summary judgment on that issue.

---

[2] Sarco Creek Cattle Co., LLC, and Sarco Creek Land & Cattle Company, LLC are also named as Defendants in this case; the Greesons manage Sarco Creek Cattle Co. Docket Entry No. 23 ¶ 6; Docket Entry No. 39-8 at 2.

[3] This confusion apparently extended to a Mariachi band the Greesons hired that accidentally arrived, unannounced, at the home of a Goliad County resident looking for a Sarco Creek Ranch. Docket Entry No. 34 at 10. Notably, however, Parmley has not introduced any evidence showing that potential purchasers of his horses have been confused about the two ranches.

Parmley then brought this case in the Houston Division of the Southern District, asserting claims for trademark infringement and unfair competition under federal and state law.[4]  The Greesons counterclaimed for cancellation of Parmley's state trademarks, and asserted that his federal registered mark is invalid.  After a venue transfer brought the case to this Division, the Court denied Parmley's attempt to dismiss the Greesons' counterclaims for cancellation of the "Sarco Creek Ranch" registrations and a declaratory judgment.  Min. Entry, Mar. 27, 2014.  Parmley then filed a motion for preliminary injunction, on which the Court held a hearing and received evidence.  *See* Docket Entry Nos. 34, 39, 40.

The Greesons defend against the injunction on several grounds: in their view, the marks will not lead to marketplace confusion because, among other reasons, the ranches market different "products"; Parmley did not use his mark in commerce; and he delayed so long in bringing suit that he cannot show irreparable harm even if he is likely to succeed on the merits.  But their most fundamental concern is the same one that they litigated in front of the TTAB: whether the Sarco Creek Ranch mark is eligible for federal trademark protection.  If Parmley fails on that front, the injunction cannot issue.  *Cf. La Union Del Pueblo Entero v. Fed. Emergency Mgmt. Agency*, 608 F.3d 217, 225 (5th Cir. 2010) ("Because we have determined that Plaintiffs cannot show a substantial likelihood of success on the

---

[4] The federal lawsuit had the effect of staying the TTAB proceedings.

4

merits, we need not address FEMA's additional arguments regarding the other necessary elements for preliminary injunctive relief.  The holding on the initial element is sufficient to vacate the injunction.").

## II.   PRELIMINARY INJUNCTION STANDARD

Courts do not issue preliminary injunctions lightly; indeed, it "frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A C. Wright, A. Miller, & M. Kane, FEDERAL PRACTICE AND PROCEDURE § 2948, 129–30 (2d ed. 1995) (footnotes omitted)); *see, e.g.*, *Ridgely v. Fed. Emergency Mgmt. Agency*, 512 F.3d 727, 734 (5th Cir. 2008) ("A preliminary injunction is an extraordinary remedy" that district courts have discretion to grant or deny).  As the party seeking a preliminary injunction, Parmley must demonstrate:

> (1) a substantial likelihood of success on the merits;
> (2) a substantial threat that [he] will suffer irreparable injury if the injunction is not issued;
> (3) that the threatened injury to [him] outweighs any damage the injunction might cause the opponent; and
> (4) that the injunction will not disserve the public interest.

*Blue Bell Bio-Med. v. Cin-Bad, Inc.*, 864 F.2d 1253, 1256 (5th Cir. 1989).  As discussed above, the Greesons primarily contend that Parmley has not shown a substantial likelihood of success on the merits, and that is where the Court turns its

5

attention first.

### III. DISCUSSION

#### A. Burden at the preliminary injunction stage

A federal trademark registration is "prima facie evidence of the validity of the registered mark." 15 U.S.C. § 1115(a). The Greesons do not contest that Parmley formally obtained a federal trademark for the Sarco Creek Ranch mark. They argue, however, that Sarco Creek is primarily geographically descriptive, and thus, ineligible for trademark protection. *See* 15 U.S.C. § 1052(e) (excluding marks that are "primarily geographically descriptive" from trademark protection). In the normal course, the party challenging the validity of the trademark would have the initial burden on that point. *See Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 237–38 (5th Cir. 2010) ("[P]roof of the registration of a mark with the PTO constitutes prima facie evidence that the mark is valid and that the registrant has the exclusive right to use the registered mark in commerce with respect to the specified goods or services."). But at this preliminary injunction stage, Parmley must demonstrate a substantial likelihood of success; that necessarily encompasses showing that he will overcome the Greesons' affirmative defense. *See Sugar Busters LLC v. Brennan*, 177 F.3d 258, 267 (5th Cir. 1999) (putting burden on plaintiff to show secondary meaning of its mark in response to defendants' affirmative defense at preliminary injunction stage); *Union Nat. Bank*

*of Tex., Laredo, Tex. v. Union Nat. Bank of Tex., Austin, Tex.*, 909 F.2d 839 (5th Cir. 1990) ("A party seeking an injunction for trademark infringement must clear several hurdles in order to prevail. First, he must prove that the name he seeks to protect is eligible for protection."). This is the traditional way that federal courts have synthesized the countervailing burdens that apply to parties invoking intellectual property defenses and those seeking preliminary injunctions. In *American Visuals Corp. v. Holland*, for instance, the district court denied the plaintiff's request for a preliminary injunction. Affirming, the Second Circuit noted conflicting evidence "as to the validity of plaintiff's copyright" in light of the defendant's prior publication defense. 219 F.2d 223, 224 (2d Cir. 1955); *see also Dymo Indus., Inc. v. Tapeprinter, Inc.*, 326 F.2d 141, 142 (9th Cir. 1964) ("From the record before us, we think the appellee has taken a sufficient stride toward meeting the burden of proving invalidity cast upon it by the statutory presumption that we cannot say there was an abuse of discretion by the District Court in finding, in effect, that there is great doubt as to the validity of the trademark."). Accordingly, Parmley has the burden of showing a substantial likelihood that his trademark will withstand the Greesons' defense that it is invalid.

7

## B. Is Sarco Creek primarily geographically descriptive?[5]

A mark is primarily geographically descriptive if "the primary significance the term would have in the marketplace for the particular services in question is geographic, that is, that the term names a place. Further, it must be shown that there is a basis for prospective purchasers of such services to make an association between the place named by the term and the services." *MCO Props., Inc.*, 38 U.S.P.Q.2d 1154, 1995 WL 838977, at *2 (T.T.A.B. 1996); *see also* Joseph C. Daniels, Note, *The Branding of America: The Rise of Geographic Trademarks and the Need for a Strong Fair Use Defense*, 94 IOWA L. REV. 1703, 1721 (2009) ("The law is well settled that a word or phrase identifying a product made in that location is primarily geographically descriptive."). Geographically descriptive terms that are "used merely to indicate the location or origin of goods and services . . . cannot, without more, serve the trademark function of identifying one person's goods and distinguishing goods made or sold by others in the same locality." 2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 14:1 (4th ed.). Although "not all locales are of special importance to consumers, merchants should remain free to indicate their place of business or the origin of their goods without unnecessary risk of infringement." *Id.* (quoting RESTATEMENT THIRD,

---

[5] One potential wrinkle to this question is that Parmley's registered mark also includes the word "ranch." The Greesons contend that "'Ranch' is generic as used by Plaintiff in its purported mark, because Plaintiff is a ranching business in the ordinary sense of that term." Docket Entry No. 13 ¶ 136. Parmley has not attempted to refute this argument, and the Court agrees with the Greesons: "Ranch," as used in this context, is generic, and does not change the Court's calculus.

8

UNFAIR COMPETITION § 14, comment d (1995)). The historic rule therefore was that trademarks did not attach to geographically descriptive names. *See, e.g.*, Robert Brauneis & Roger E. Schechter, *Geographic Trademarks and the Protection of Competitor Communication*, 96 TRADEMARK REP. 782, 785–91 (2006) (tracing the history of trademark protections for geographically descriptive terms); Deborah J. Kemp & Lynn M. Forsythe, *Trademarks and Geographical Indications: A Case of California Champagne*, 10 CHAP. L. REV. 257, 284 (2006); *see also Sharcoal Steak House of Charlotte, Inc. v. Staley*, 263 N.C. 199, 201 (N.C. 1964) ("At common law generic, or generally descriptive, words and phrases, as well as geographic designations, may not be appropriated by and business enterprise either as a tradename or as a trademark.").

This remains the general rule today, but exceptions exist for geographic names when "it could be proven that customers would not associate the goods with that place named." MCCARTHY § 14:29 (4th ed.). On one end of the spectrum, a trademark can issue if a geographic term is used, but its particular usage is arbitrary and clearly does not indicate the specific location of the business. A Sarco Creek Café in Seattle might qualify. *See, e.g., id.* § 14:7 ("[A]rbitrary uses of geographical terms would be NORTH POLE for bananas; SALEM for cigarettes; ATLANTIC for magazines; ENGLISH LEATHER for men's after-shave lotion; or ARCTIC for ice cream."). *But see* 15 U.S.C. § 1052(e) (banning

9

registration of trademarks that are "deceptively misdescriptive"). On the other end, even when a geographically descriptive name does indicate a well-known place where the business is located, a business may build up secondary meaning in the mark. Secondary meaning "in connection with geographically descriptive marks means that the mark no longer causes the public to associate the goods with the geographical location, but to associate the goods with a particular product or source of the product." MCCARTHY § 14:1 (quoting *OBX-Stock, Inc. v. Bicast, Inc.*, 558 F.3d 334, 340 (4th Cir. 2009)); *see, e.g.*, Daniels, *The Branding of America*, at 1723 (noting that the Chicago Tribune is trademarked because it "identifies a particular newspaper company and thus has a strong secondary meaning."); MCCARTHY § 14:9 (citing numerous examples of geographic terms that have acquired secondary meaning, such as Miss U.S.A., Pinehurst, California Cooler, Newport Boat Show, Western Bank).

Although his ranch has existed for over fifty years, Parmley did not seek to establish secondary meaning at the injunction hearing. Instead he relies on the principle that terms with a specific geographical connotation, but that refer to remote or obscure places, can be trademarked. MCCARTHY § 14:29 n.5 (4th ed.) (citing *In re Bavaria St. Pauli Brauerei AG*, 222 U.S.P.Q. 926, 1984 WL 63074 (T.T.A.B. 1984), which held that "JEVER for beer from the tiny town of Jever, Germany, does not primarily denote a geographical place to reasonably informed

10

American customers and is not primarily geographically descriptive"). The TTAB has explained that obscurity is a different side of the arbitrariness coin: "A geographic name is not unprotectible or unregistrable because it can be labeled a geographic name, but because it tells the public something about the product or the producer absent which his competitor also has a right to inform the public. Thus, the names of places devoid of commercial activity are arbitrary usage." *Bavaria*, 1984 WL 63074 at *1. Usage is also arbitrary when "the geographic significance of a name is lost on the public because of obscurity." *Id.* at *2 (quotation marks and internal citation omitted). With such usages, the public will not associate the geographically descriptive term with the unknown locale, but instead with the particular business using the name. *See MCO Props.*, 1995 WL 838977, at *2 (explaining the services-place association—whether "there is a basis for prospective purchasers of [] services to make an association between the place named by the term and the services"—that is the reason primarily geographically descriptive terms are not protected).

This obscurity argument leads to an important question: Obscure to which prospective purchasers? Parmley contends that Sarco is nothing but a ghost town, Docket Entry No. 33 ¶ 1, and Sarco Creek is a trivial stream that no one knows or cares about. Naturally, Sarco Creek would be obscure to a New Yorker (it is likely obscure to the average Houstonian), but that is not the nature of the inquiry.

11

Rather, the services-place association is evaluated "from the perspective of the relevant public for those services." *MCO Props.*, 1995 WL 838977, at *3. In *MCO Properties*, for instance, the TTAB determined that "the relevant purchasing public for applicant's service of developing real estate includes people considering purchasing real property in Fountain Hills, Arizona." *Id.* And in *Societe Generale des Eaux Minerales de Vittel, S.A.*, 824 F.2d 957, 959 (Fed. Cir. 1987), the Federal Circuit held that the goods-place association for a perfume named "Vittel" should be evaluated from the perspective of "a segment of the American public, in this case the mill-run of cosmetics purchasers."

The relevant market in this case is people who purchase specialty horses, cattle, hay and other ranching services and goods in the market that Parmley serves. On this preliminary injunction record, that market appears limited to Texans who live in or near Goliad County. *Cf. Joint-Stock Co. "Baik"*, 80 U.S.P.Q.2d 1305, 2006 WL 1706437, at *5 (T.T.A.B. 2006) (noting that many purchasers of Russian vodka are "likely to be aware of the geographic significance of the mark [of a lake in Russia] because they are most likely either from Russia, have Russian relatives, or became familiar with Russia, including major geographic sites, when learning the language."); *MCO Props.*, 1995 WL 838977, at *2 ("In this case, the services for which applicant seeks to register 'FOUNTAIN HILLS' are in fact rendered in Fountain Hills."). For instance, Parmley sold 92

12

head of cattle at an auction in Dewitt County, which is adjacent to Goliad County. Docket Entry No. 34-3 at 71–72. He also sold five horses to people in Goliad and Refugio Counties. Docket Entry No. 39-7 at 3–4. By contrast, he only sold four horses, to two individuals, outside the general Goliad County area. Docket Entry No. 34-3 at 18–21, 59–60. And even one of those purchasers drove to Parmley's ranch to personally see the horse before she bought it. *Id.* The question is thus whether this relatively circumscribed, self-selected group of customers, who generally hail from Goliad County and neighboring counties and appear quite familiar with ranching in Texas, would associate Sarco Creek as the geographic place where Parmley offers goods and services.

The evidence suggests that they would. Sarco, Texas and Sarco Creek have a long and surprisingly rich history.[6] Sarco Creek has been identified on maps of Texas since the 1840s and was used as a boundary marker in the Mexican land grants that were issued to the colonists who settled the area. Docket Entry No. 39-9. More recently, Sarco has been in the news because of a "Sarco Concerned Citizens" group, organized by Parmley himself, dedicated to vigilante activities along the Mexican border. Docket Entry No. 39-13. And although Sarco is not a large city, neither is it a ghost town. As of the 2000 census, the population was 78.

---

[6] Of course, Goliad County itself played a seminal role in the Texas War of Independence. In what is now referred to as the Goliad Massacre, over 300 Texian soldiers were slaughtered after Mexican forces captured and housed them in the fort in Goliad that had previously served as the soldiers' base. Today, a monument bearing the victims' names sits at the site of the killings.

Docket Entry No. 34-3 at 75.  Indeed, one Victoria County resident who has been involved in agriculture and farming his entire life testified that, in the present day, "Sarco Creek and Sarco are well-known in the ranching community in Goliad County and the surrounding counties.  Sarco Creek is a major landmark in southern Goliad County, which is a sparsely populated coastal prairie."  Docket Entry No. 39-8 at 5; *see also id.* at 7 (rancher in Goliad County testifying that "[t]here is not a lot of water in this part of Texas," and because of that, Sarco Creek is a "major geographical feature in this part of Goliad County.").  It is no wonder, given this evidence, that both Parmley's and the Greesons' ranches—and at least two others, one named "Sarco Ranch" and the other named "Agua Sarca Ranch"—are rooted along the creek's contours.  Docket Entry No. 39-8 at 7–8.  This evidence, combined with Parmley's failure to argue secondary meaning, leads to one conclusion: Parmley is unable to show on the present record a substantial likelihood of success on his trademark infringement claim.

Decisions from both the TTAB and the Fifth Circuit support this outcome.  In *MCO Properties*, the TTAB considered whether the name "Fountain Hills," used in connection with real estate sales in Fountain Hills, Arizona, was primarily geographically descriptive. The TTAB concluded that:

> In the case at hand, the relevant purchasing public for applicant's service of developing real estate includes people considering purchasing real property in Fountain Hills, Arizona.  Whether or not they presently live in Arizona, these people are aware (or will become

14

>   aware) of the fact that "FOUNTAIN HILLS" is the name of that place where applicant is located, that is, the town promoted by applicant as a wonderful place to buy real estate. In the context of applicant's services, the place is not obscure or remote. A clearer association between these services and this place name is difficult to imagine.

38 U.S.P.Q. 2d at 1156. The facts of this case are similar; there is a "clear[] association" between a geographic Sarco Creek and the ranching services that Parmley provides to his customers.

The Fifth Circuit answered a different question: whether the word "Globe" is primarily geographically descriptive. It concluded that "Globe" "is of the terrestrial body" and therefore has no geographical significance. *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 487 (5th Cir. 1971). In reaching that result, the court distinguished "Globe" from terms that the court would consider primarily geographically descriptive, and explained why those terms do not warrant trademark protection:

>   Congress has expressly left accessible to all potential users those names of subdivisions of the earth— regions, nations, counties, towns, rivers, lakes, and other natural and artificial geographical units— which could be employed to draw public attention to the origin of a product or the situs of a business. It would obviously promote unfair competition to proscribe for all save a single producer the name of a region and thereby preclude other producers of the same product in the same region from indicating their product's origin.

*Id.* at 485; *see also MCO Props., Inc.*, 38 U.S.P.Q.2d at 1156 (explaining that the purpose of the primarily geographically descriptive restriction "is to leave place names free for all businesses operating in particular areas to inform customers

15

where the goods or services originate."); *Chrysler Grp. LLC v. Moda Grp. LLC*, 796 F. Supp. 2d 866, 872–73 (E.D. Mich. 2011) (rejecting preliminary injunction motion to prevent competitor from using phrase "Imported From Detroit" because the phrase "simply describe[es] the geographical origin of the goods as the city of Detroit"); *see also id.* (citing *Ligotti v. Garofalo*, 562 F. Supp. 2d 204, 215 (D.N.H. 2008), which found the phrase "The Guy from Boston" unprotectable because all it did was describe a normal man from Boston); MCCARTHY § 14:29 (citing numerous examples of primarily geographically descriptive marks, including California Pizza Kitchen, Carolina Apparel, Denver Westerns, Minnesota Cigar Company, Yosemite Beer, and Nantucket Nectars).

In one of the only decisions that Parmley relies on finding a geographic name obscure, the TTAB considered whether average American consumers would associate a beer brand with a small neighborhood in Aruba. *Brouwerij Nacional Balashi NV*, 80 U.S.P.Q.2d 1820, 2006 WL 2223449 (T.T.A.B. 2006). The TTAB concluded that the name at issue, Balashi, was "so obscure or remote that purchasers of beer in the United States would typically fail to recognize the term as indicating the geographical source of applicant's goods." *Id.* at *4. "Balashi is not the name of a city, county or district within the island 'country' of Aruba"; rather, it was "a small and commercially insignificant neighborhood in the district of Santa Cruz with no boundaries and no official status." *Id.* at *7 (internal quotation

16

marks omitted).  The considerable evidence discussed above demonstrates the opposite about Sarco and especially, Sarco Creek—that while it may be a relatively small, humble stream, it is historically significant and well-known to the largely local and niche-market customers that both parties target.  At this stage, the Court is dubious that Parmley can overcome that compelling evidence undermining a claim of obscurity and therefore concludes that a preliminary injunction cannot issue.

**IV.   CONCLUSION**

For the reasons explained above, Parmley is unable to show a likelihood of success in light of the Greesons' defense that "Sarco Creek Ranch" is primarily geographically descriptive.  Accordingly, Plaintiffs' Motion for Preliminary Injunction (Docket Entry No. 34) is **DENIED**.

**SIGNED** this 3rd day of July, 2014.

_____
Gregg Costa
United States Circuit Judge[*]

---

[*] Sitting by designation.

17