UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| SARCO CREEK RANCH, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 6:14-CV-13 |
| | § | |
| MILTON GREESON, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## **MEMORANDUM AND ORDER**

Defendants sought summary judgment on the issue, among others, that "Sarco Creek Ranch" is merely geographically descriptive and thus not entitled to trademark protection. Docket Entry No. 89. In response (Docket Entry No. 101), Plaintiffs argued (1) that Sarco Creek Ranch is not geographically descriptive, and (2) even if it is, the name is still entitled to trademark protection because it has acquired secondary meaning. *See* 15 U.S.C. § 1052(f) (allowing registration if mark has become "distinctive of the applicant's goods in commerce").

The Court orally denied summary judgment on the ground that geographic descriptiveness is an issue for the jury given disputes about whether the name is too obscure. It thus did not need to address Plaintiffs backup argument that Sarco Creek Ranch has acquired secondary meaning. The Court will nonetheless rule at this time on the two issues Defendants raised concerning secondary meaning as doing so will help focus the issues for trial.

Defendants first argue that Plaintiffs should not be able to argue secondary meaning because they did not plead it as an affirmative defense in response to Defendant's counterclaim for cancellation of registration. In support, they cite *Coach Services, Inc. v. Triumph Learning LLC*, 668 F.3d 1356 (Fed. Cir. 2012), in which Triumph sought to trademark "COACH" for its educational materials but faced opposition in the TTAB from another company that uses "COACH" for luxury goods like handbags. In addressing a secondary meaning issue, the Federal Circuit noted that Triumph had raised the issue as an affirmative defense in response to the notice of opposition filed in the TTAB. *Id*. at 1379.

The Court is not convinced, however, that *Coach Services* precludes Plaintiffs from raising an issue of secondary meaning. In addition to the fact that it arose in an agency proceeding rather than a lawsuit, *Coach Services* merely notes in passing how the secondary meaning question was presented. It does not say it must be pleaded as an affirmative defense. Nor could the Court find any case saying so or barring the issue from being raised because it was not asserted as an affirmative defense. Plaintiffs have in this case alleged that they have a protected trademark in "Sarco Creek Ranch" and Defendants had plenty of notice that Plaintiffs would seek to raise secondary meaning because the issue was raised early in the case during preliminary injunction briefing. Docket Entry No. 33 at 3; Docket Entry No. 40 at 5–6.

Although the Court does not reject Plaintiffs' secondary meaning argument on the basis of pleading deficiencies, it finds more convincing the second issue Defendants raise: that the survey Plaintiffs are using to support secondary meaning is inadmissible. Despite the general rule that methodological errors speak to weight, rather than admissibility, the Fifth Circuit requires that secondary meaning surveys reflect a "fair sampling of those purchasers most likely to partake of the alleged infringer's goods or services." *Honestech, Inc. v. Sonic Sols.*, 430 F. App'x 359, 362 (5th Cir. 2011) (quoting *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 487 (5th Cir. 2004)). Indeed, the "adequacy of the universe" sampled is one of the two key factors that is examined in evaluating the validity of a survey (the other is "the way in which participants are questioned"). *Id.* at 361.

In *Honestech*, the plaintiffs sold software that converted VHS tape to DVD and obtained a corresponding trademark, "VHS to DVD," but the defendants had been selling a similar product labeled "Easy VHS to DVD." *Honestech*, 430 F. App'x at 363–64. The Fifth Circuit upheld the plaintiff's secondary meaning survey as a fair sampling, even though the survey was overbroad because it included past purchasers of audio and video equipment generally and not just those who intended to purchase VHS to DVD conversion software in the future. *Id.* at 361–62, 364. Because the software was purchased on a one-time or an otherwise infrequent basis, the survey screening questions reflected a reasonable

methodology to identify the relevant universe of consumers. *Id.* at 362.

In contrast to the reasonable if imperfect methodology utilized in *Honestech*, there is no indication that the 36 declarations the Plaintiffs submitted utilized any screening methodology that would allow them to be called a "survey." The only information Plaintiffs provided to the Court are the declarations (Docket Entry No. 105-7), each accompanied by a one-page question form, and the single accompanying bar graph summarizing the resulting "findings" (Docket Entry No. 105-6); the survey and a representative question form are attached to the end of this Opinion. Plaintiffs' summary judgment response does not even refer to these documents as a survey, but rather dubs them "[d]irect consumer testimony" from "declarations." Docket Entry No. 101, at 18. Going out and procuring declarations from a selected group is in no way a "survey" of secondary meaning, which requires sampling randomly selected members of the relevant consumer population. If a person went out and asked her friends "have you ever heard of me?," the overwhelmingly positive response from that would not demonstrate that the person is famous. That is essentially what Plaintiffs have done here in seeking declarations from persons already familiar with Plaintiffs.

It's thus not surprising that just about everyone solicited by Plaintiffs to submit a declaration associated "Sarco Creek Ranch" with Plaintiffs. 100% of

participants associated "Sarco Creek Ranch" with Plaintiff William Parmley.[1] Docket Entry No. 105-7, at 1–79. This is an astronomically high level of secondary meaning. Secondary meaning surveys for marks of businesses with a far more extensive commercial presence show much lower rates of recognition. *See In re Owens-Corning Fiberglass Corp.*, 774 F.2d 1116 (Fed. Cir. 1985) (noting that the 50% of consumers who associated "pink" insulation with Owens-Corning was a "percentage considerable greater than that held sufficient in many cases"). To take one example, Zatarain's "Fish-Fri," marketed since 1950 and registered as a trademark in 1962, was recognized in the early 1980s by only 23% of randomly sampled New Orleans-area women who fried seafood three or more times per month. *See Zatarains, Inc. v. Oak Grove, Smokehouse*, *Inc.*, 698 F.2d 786, 795 (5th Cir. 1983), *abrogated on other grounds by KP Permanent Make-Up, Inc. v. Lasing Impression I, Inc.*, 543 U.S. 111 (2004).

Rather than helping Plaintiffs prove secondary meaning, the extraordinarily high rates of association thus actually expose the lack of any methodology to support the reliability of the results. In considering a similarly flawed survey with extraordinarily high recognition rates, the Fifth Circuit recognized that secondary meaning is not established when the survey relies primarily on those who are already using the product. *Sno-Wizard Mfg., Inc. v. Eisemann Products Co.*, 791

---

[1] For unknown reasons, one participant was not asked whether she associated Bill Parmley with Sarco Creek Ranch. Docket Entry No. 105-7, at 60.

F.2d 423, 427 (5th Cir. 1986). In *Sno-Wizard*, the Fifth Circuit found no fault in a district court's refusal to find secondary meaning even though a survey found that 84% of respondents in New Orleans could identify the configuration of the snow ball machine for which trade dress protection was sought. *Id.* The reason for discrediting those seemingly pro-plaintiff results was that 43 of the 50 people surveyed already used the product. *Id.* The same flaw exists here and the 36 declarations do not constitute a fair sampling.

But this is not the only problem. A survey's trustworthiness depends on the following:

> (1) [T]he "universe" was properly defined, (2) a representative sample of that universe was selected, (3) the questions to be asked of interviewees were framed in a clear, precise and nonleading manner, (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted, (5) the data gathered was accurately reported, (6) the data was analyzed in accordance with accepted statistical principles, and (7) objectivity of the entire process was assured.

3 CALLMANN ON UNFAIR COMPETITION, TRADEMARKS & MONOPOLIES § 20:23 (4th ed., 2014), Westlaw (database updated August 2015). In addition to failing to identify a fair sampling of the relevant universe of consumers, Plaintiffs produced only the questionnaires without any explanation of what interview procedures were used, how the data was collected and analyzed, or even how the objectivity of the survey process was ensured.

There are numerous inconsistencies between the declarations and the bar

graph that purports to summarize the results. First, there are only 36 declarations (Docket Entry No. 105-7), not 41 as Plaintiffs' attorney repeatedly states in her briefing (Docket Entry No. 101, at 5, 18, 38). Because the bar graph only shows percentages without the underlying mathematical calculations, this Court can only assume that the percentages are also inaccurate. Moreover, the bar graph purports to show that 85% of respondents had heard of "Sarco Creek Ranch," but this was not even a question on the survey form. Because all of the respondents in the submitted declarations stated that they had knowledge of Sarco Creek Ranch, it is impossible for this Court to comprehend how this percentage was even calculated. Another problem is that participants received varying questions.[2]

The questions are also leading—"Do you associate Bill Parmley with Sarco Creek Ranch?" rather than "what person or business do you associate with Sarco Creek Ranch?"[3]—which means they do not capture "*unprompted* consumer reaction as to association between a given trade symbol and a given source of the product." *See Sno-Wizard Mfg.*, 791 F.2d at 427 (emphasis added) (quoting 1

---

[2] *See, e.g.*, *supra* note 1.
[3] In *Zatarains*, the trademark holders asked survey participants the following questions: "If you planned to fry fish tonight, what would you buy at the grocery to use as a coating?" and "Are you familiar with any product on the market that is especially made for frying fish?" 698 F.2d at 793 n.4. The Fifth Circuit noted that these "broad hints" about the place of purchase, the nature of the product, and its function were far too suggestive to indicate an associational link between the mark "Fish-Fri" and Zatarain's product. *Id.* But the survey questions here are even more problematic than those in *Zatarains* because they directly name William Parmley the owner of Sarco Creek Ranch, rather than just the traits associated with his ranch.

McCarthy, TRADEMARKS & UNFAIR COMPETITION § 15:13, at 690)). Also problematic is that Plaintiffs' counsel appears to have administered the survey herself, rather than through an independent party or expert. *See, e.g.*, Docket Entry No. 105-7, at 60 (survey requiring return to Plaintiffs' attorney); Docket Entry No. 105-7, at 5 (personal email exchange between a survey participant and Plaintiffs' attorney inquiring as to whether Plaintiffs' attorney received returned survey). In short, Plaintiffs' survey has no indicia of reliability. The purported survey of secondary meaning is therefore excluded from trial.

SIGNED this 3rd day of December, 2015.

_____
Gregg Costa
United States Circuit Judge[*]

---

[*] Sitting by designation



| | | |
|---|---|---|
| 1. | Which of the following have you purchased from Sarco Creek Ranch?  Horses | 24% |
| 2. | Which of the following have you purchased from Sarco Creek Ranch?  Other Products | 68% |
| 3. | Do you associate this Logo with Bill Parmley's Sarco Creek Ranch? | 85% |
| 4. | Heard of Sarco Creek ? | 85% |
| 5. | Do you associate Sarco Creek Ranch with the sale of famous bloodlines of Appaloosa horses or semen? | 78% |
| 6. | Do you associate SCR with Sarco Creek Ranch? | 83% |
| 7. | Do you associate the hunting photographs of Sarco Creek Ranch on the internet with Bill Parmley's Sarco Creek Ranch? | 68% |
| 8. | How long have you known about Sarco Creek Ranch?  6 yrs or more | 65% |

How many from Texas?  17

9 / 10

Please complete the questions below and return to dmjamesjd@aol.com or mail to Delephine James 2616 South West Loop Suite 415 Houston, TX 77054      EXHIBIT D

Name  Bryn A Russell    Email address bryn.russell@me.com
Where are you located  San Antonio TX

Do you purchase Appaloosa horses? ___ yes  X no

What is the average price? ___ $0-$1000 ___ $1000-$5000 ___ $5000-$10,000 ___ $10,000 & up

Do you purchase Appaloosa horse semen? ___ yes  X no

What is the average price? ___ $0-$100 ___ $100-$500 ___ $500-$1000 ___ $1000 & up

Do you search the National Appaloosa Horse Club directory for horses? ___ yes ___ no

Do you search the National Appaloosa Horse Club for a specific breeder, genetics, color, owner, pedigree, production, history, points, statistics? ___ yes  X no

When purchasing an Appaloosa horse which of the following are important to you? ___ bloodlines ___ genetics ___ color ___ breeder ___ pedigree ___ production ___ history ___ points ___ statistics

Do you search All Breed Horse Pedigree? ___ yes  X no

Do you search All Breed Horse Pedigree for ___ breed, ___ color, ___ height, ___ production, ___ history, ___ pedigree

Which of these foundation bloodlines do you consider famous? ___ Prince Plaudit ___ Joker B ___ Wapiti ___ Wap Spot 2  X Waps Millennium ___ Waps Rolls Royce ___ Waps Reflection ___ Chocklate Confetti ___ Easy Jet ___ Native Dancer ___ Three Bars ___ Impressive ___ Executive Production ___ Zip Cochise ___

Would you search the Appaloosa Horse Club for these famous bloodlines? ___ yes  X no.

Is color important to you? ___ yes  X no

Would you purchase a horse from a breeder that has 13 generations of leopard breeding?  X yes ___ no.

Do you know Sarco Creek Ranch to sell Appaloosa Horses?  X yes ___ no

Would you purchase a horse from Sarco Creek Ranch?  X yes ___ no

Would you purchase semen from Sarco Creek Ranch?  X yes ___ no

When did you first come to know Sarco Creek Ranch?  1981  year.

How long have you known about Sarco Creek Ranch?  33  years

Do you know Sarco Creek Ranch to sell Appaloosa Horse Semen?  X yes ___ no

How did you learn about Sarco Creek Ranch? ___ Facebook ___ Advertising ___ ApHC ___ National Classified Ad  X Website  X Internet  X Personal Referral ___ Texas Classified Ad

Which of the following do you know Sarco Creek Ranch to Advertise the sale of  X Appaloosa Horses  X Semen  X Cattle  X Hay  X Australian Cattle Dogs  X Australian Shepherds  X Honey  X Pecans  X Seasoning  X Salad Dressing  X Coffee Beans  X Cookbook  X T Shirts  X Caps

Which of the following have you purchased from Sarco Creek Ranch ___ Appaloosa Horses ___ Semen ___ Cattle  X Hay ___ Australian Cattle Dogs ___ Australian Shepherds  X Honey  X Pecans  X Seasoning  X Salad Dressing  X Coffee Beans  X Cookbook ___ T Shirts ___ Caps

Do you associate Sarco Creek Ranch with the sale of famous bloodlines of Appaloosa Horses or Semen? yes  X no ___

Do you associate "SCR" with Sarco Creek Ranch? yes  X no ___

Do you associate the hunting photographs of Sarco Creek Ranch on the Internet with Bill Parmley's Sarco Creek Ranch? yes ___ no ___

Do you associate Bill Parmley with Sarco Creek Ranch? yes  X no ___

Do you associate this logo  Sarco Creek 2 Ranch  with Bill Parmley's Sarco Creek Ranch? yes  X no ___