United States District Court
Southern District of Texas
**ENTERED**
March 04, 2016
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| SARCO CREEK RANCH, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 6:14-CV-13 |
| | § | |
| MILTON  GREESON, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## <u>MEMORANDUM AND ORDER</u>

It is difficult to appreciate how many exhibits are filed each year with a single federal district court judge.  A single trial will often see the parties offering hundreds of exhibits.   But most exhibits are filed in connection with dispositive motions, where they often are subject to less scrutiny for authenticity than they would receive at trial.  The volume of exhibits filed in connection with the cross motions for summary judgment in this case—totaling more than 1,000 pages—is not out of the ordinary.[1]   The justice system thus depends on the parties filing authentic exhibits.  And, of course, when parties appear in court, the system depends on them telling the truth.

In this trademark case, Plaintiff William Parmley flouted both of these fundamental requirements for a fair proceeding.  Parmley filed exhibits that he knew

---

[1] *See* Docket Entry No. 89 (297 pages of exhibits); Docket Entry No. 96 (148 pages); Docket Entry No. 100 (414 pages); Docket Entry No. 101 (266 pages); Docket Entry No. 104 (121 pages).

to be fabricated.  When given the opportunity to explain the origin of the exhibits, he chose to lie.  The Court concludes that the only proper remedy for this serious and repetitive misconduct is sanctions that result in dismissal of the claims he asserts and the entry of default judgment in favor of Defendants on their counterclaims.

## I.  BACKGROUND

### A.    The Context: Why the Calendar Exhibits Matter

Sarco Creek is a stream that runs through southern Goliad County where Parmley[2] and Defendants, the Greesons,[3] own ranches.  Both followed a common naming convention for their ranches in using a geographic identifier—"Sarco Creek Ranch."

The right to use that name is the issue in this case.  In 2011, the Greesons learned that Parmley claimed the exclusive right to use "Sarco Creek Ranch" based on trademarks he had obtained in 2008 and 2009.  The Greesons initiated cancellation proceedings in the Trademark Trial and Appeal Board (TTAB) of the United States Patent and Trademark Office on the grounds that Parmley had not been engaged in bona fide commercial use of the mark and that the mark was primarily

---

[2] Sarco Creek Ranch LLC, operated by Parmley after he organized it under Texas law in 2010, is also a plaintiff in this suit. Docket Entry No. 34-3 at 82.

[3] Sarco Creek Cattle Co., LLC, and Sarco Creek Land Development are also named as Defendants in this case; the Greesons manage Sarco Creek Cattle Co. Docket Entry No. 23 at ¶ 6; Docket Entry No. 39-8 at 2.  All Defendants are referred to as the "Greesons" to avoid confusion arising from use of the various Sarco Creek entities.

geographically descriptive.  Parmley filed a motion for summary judgment on those issues, which the TTAB denied.

After Parmley received the unfavorable ruling in the TTAB, he filed this lawsuit asserting claims for trademark infringement under federal and state law as well as a variety of state tort claims.  This had the effect of staying the administrative proceeding.   The Greesons counterclaimed for cancellation of Parmley's state and federal registrations for Sarco Creek Ranch on the grounds that the mark is primarily geographically descriptive, Parmley had not engaged in prior use of the mark before registering it, and there was no commercial use of the mark.  Docket Entry No. 47 at ¶ 227–30, ¶ 233–35.

Parmley filed a motion for a preliminary injunction.  After a hearing, the Court denied the motion because Parmley had not established a likelihood of success in light of the defense that "Sarco Creek Ranch" is primarily geographically descriptive.  Docket Entry No. 44; *Sarco Creek Ranch v. Greeson*, 36 F. Supp. 3d 726, 731–35 (S.D. Tex. 2014).

The parties later filed cross motions for summary judgment.  As to their counterclaim seeking the cancellation of Parmley's federal trademark, the Greesons argued among other things that Parmley's use of the mark was *de minimis* and did not constitute commercial use.  Docket Entry No. 89 at 9–16.  Parmley countered with his own summary judgment motion, arguing that the Greesons' commercial use

affirmative defense failed as a matter of law.  Docket Entry No. 94 at 6.  He also opposed the Greesons' summary judgment motion and cited examples of his bona fide use of the Sarco Creek mark allegedly dating from the 1960s.  Docket Entry No. 101 at 7–19.

The Court denied Parmley's motion for summary judgment on the papers with the exception of the Greesons' commercial use defense.  *See* Docket Entry No. 112. It reserved ruling on that issue and on the Greesons' motion for summary judgment until a hearing was held.  At the hearing, the Court ruled orally on the remaining issues[4] except for the Greesons' argument that Parmley's lack of commercial use invalidated the registration.

It is helpful at this point to explain the commercial use issue.  The "Lanham Act grants trademark protection only to marks that are used to identify and to distinguish goods or services in commerce—which typically occurs when a mark is used in conjunction with the actual sale of goods or services."  *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1051 (9th Cir. 1999). Parmley registered his trademark as one providing retail store services in the cattle and equine industries.  Docket Entry No. 89 at 2.  In a "use-based application" such as Parmley's, "when at the time of registration there was no use of any of the goods

---

[4] The Court denied the Greesons' arguments for summary judgment on their prior use and laches defenses, but granted the portions of their motion seeking dismissal of Parmley's misrepresentation and misappropriation claims.  Minute Entry for Nov. 19, 2015; Docket Entry No. 129 at 32–34.

or services specified, the application and resulting registration is void . . . . "  6 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 31:72 (4th ed. 2014).  Valid registration of Parmley's mark was a prerequisite not just for his federal infringement and counterfeiting claims under Section 32(a) of the Lanham Act, but also for his state law statutory claims for infringement and counterfeiting.  TEX. BUS. & COM. CODE §§ 16.102, 16.104.  Registration is not necessary for the claims Parmley brought under Section 43(a) of the Lanham Act and Texas common law.  But cancellation of the registration would result in him having to litigate validity for those claims without a presumption in his favor.  Cancellation of Parmley's registration for lack of use would thus result in dismissal of most of his claims and would make the remaining claims more difficult to prove.

The Greesons argued that cancellation was appropriate because Parmley's use of the mark was *de minimis*, relying heavily on *La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1272–73 (2d Cir. 1974), in which the Second Circuit held that eighty-nine sales of perfume over twenty years failed to amount to bona fide commercial use.  Docket Entry No. 89 at 10–16.  The Greesons argued that like the perfume company, Parmley engaged in only sporadic sales prior to registration in 2009 that were insufficient to constitute bona fide commercial use. Docket Entry No. 89 at 10–16.  Although they acknowledged that advertising can also prove use of a mark, they argued that Parmley's advertising was also

insufficient.  Docket Entry No. 89 at 15–16; *see* 15 U.S.C. § 1127 (definition of "use in commerce").

In his response, Parmley conceded that his sales were "modest," but emphasized that unlike the perfume company in *Jean Patou*, he had engaged in advertising in hopes of creating a commercially successful business.  Docket Entry No. 101 at 7–10.  Advertising was the crux of Parmley's commercial use argument because his horse sales prior to obtaining his registrations in 2008 and 2009 were negligible, one-off events; they were so minimal that he did not even report any sales on his tax returns from 2007 to 2012.  Docket Entry No. 89 at 3–4, 14–15.  Defendants countered in their reply that Parmley's use of post-registration evidence of advertising was immaterial because what matters is use of the service mark *at the time of registration*. Docket Entry No. 102 at 7–8; *see also Blue Bell, Inc. v. Farah Mfg. Co., Inc.,* 508 F.2d 1260, 1267 (5th Cir. 1975) (stating that a mark must be in bona fide use at time of registration in order to be valid); *M.Z. Berger & Co., Inc. v. Swatch AG*, 787 F.3d 1368, 1374–75 (Fed. Cir. 2015) (noting that while an application may be made for registration based on a bona fide intent to use the mark in commerce, actual commercial use must be shown before registration); 6 McCarthy, § 31:72.

There are two reasons why the Court reserved ruling on the commercial use issue at the hearing, leaving it as the only one of the numerous summary judgment

issues yet to be resolved, even though trial was quickly approaching. First, it was a "close call" that was likely to turn on Parmley's ability to establish advertising that was more than *de minimis*. Second, as to that advertising question, the Court had questions about an exhibit Parmley had offered in an attempt to show pre-registration advertising.

### B.   The Court Inquires about the 2006 Calendar

That exhibit—what appeared to be a scan of the 2006 Mexican Heritage calendar (Docket Entry No. 105-5 at 4–6)[5]—was one of the few documentary pieces of evidence[6] that Parmley had submitted purportedly showing pre-registration advertising. The calendar, which includes photos of Mexican heroes from the Revolution that took place from 1910–1920, is produced annually by Dos Amigos Publishing, which is located in south Texas. The calendars are sold to various businesses, which place their advertisement on a bottom flap so it appears below the calendar even as the remaining portion of the calendar flips each month. Anyone who frequents the offices of dentists or insurance agents has likely seen such calendars, with images of Americana often providing the calendar theme.

---

[5] The Court later learned that the exhibit was a scan of a postcard featuring the image of the 2006 Mexican Heritage calendar. *See* Docket Entry No. 131 at 19–20, 38–39.

[6] Another was a classified ad for the sale of an individual horse, but that ad did not even advertise regular horse services or otherwise indicate that there was a selection of horses. *See* Docket Entry No. 101-1 at 57.

In reviewing what it thought to be the 2006 calendar, the Court noticed that the bottom flap that normally contains the advertisement was missing.  "Sarco Creek Ranch" appeared nowhere on the calendar.  This was at odds not just with the Court's general understanding of these types of calendar, but also with a similar 2014 Mexican Heritage calendar Parmley had submitted that did include "Sarco Creek Ranch®" on the bottom flap. *Compare* Docket Entry No. 105-5 at 5, *with* Docket Entry No. 101-1 at 67.



The 2006 calendar would be relevant only if it advertised Parmley's ranch, so the Court asked at the hearing about the lack of any mention of "Sarco Creek Ranch" on the exhibit.  Docket Entry No. 129 at 18–19.  Both Parmley and his attorney, who was engaging in discussions with her client at counsel table in response to the inquiry, represented that the name was missing from the copy of the 2006 calendar submitted as an exhibit because the wrong side of the calendar had been scanned.[7]

---

[7] As described above, the exhibit was the scan of a postcard featuring the 2006 calendar's cover image, not a scan of the calendar itself.  Parmley later testified that he "inferred" the exhibit was the calendar and that the wrong side had been scanned.  Docket Entry No. 131 at 20.

*Id.* at 18–19, 27.  This seemed plausible as Parmley's counsel had repeatedly had issues during the case with electronic filing.  *See, e.g.*, Docket Entry No. 96 (Corrected Motion for Summary Judgment).  Because this evidence was important in determining the extent, if any, of Parmley's advertising, this Court reserved ruling on the commercial use question until Parmley submitted the corrected version of the 2006 calendar that he thought existed.  Docket Entry No. 129 at 30–33.  The minute entry for the November 19, 2015 summary judgment hearing states "Pltf to submit corrected side of 2006 calendar with mention of Sarco Creek Ranch by Wednesday, Nov. 25."

### C.   Parmley Submits 2007 and 2008 Calendars That Had Never Been Disclosed in Discovery and Contained a Premature Registered Trademark Symbol

Instead of complying with the Court's simple order requesting a corrected copy of the 2006 calendar (or saying that such a copy was not available), Parmley's attorney submitted additional summary judgment briefing along with three new exhibits and copies of nine court decisions that the Court did not ask for.  Docket Entry No. 120–120-20.  The 2006 calendar exhibit was also resubmitted, but it did not remedy the concern the Court raised as, like the earlier submission, it did not mention Sarco Creek Ranch.  Docket Entry No. 120-1 at 5.  Among Parmley's new exhibits were copies of 2007 and 2008 Mexican Heritage calendars.  Docket Entry No. 120-3 at 1–2; Docket Entry No. 120-6 at 1–2.  Both submitted copies showed

Sarco Creek Ranch advertisements for registered Appaloosa horses and bore the registered trademark symbol "®" next to "Sarco Creek Ranch"—except for different colors, identical advertisements to that shown on the previously submitted 2014 calendar.



The Greesons filed a response noting suspicions about the 2007 and 2008 calendars. Docket Entry No. 121 at 6–7. They noted that the 2007 and 2008 calendars had never been produced in discovery despite numerous requests for documents demonstrating the commercial use on which the validity of Parmley's registration depended. *Id.* at 5–7. They also pointed out that the newly produced 2007 and 2008 calendars included the symbol for a registered trademark, *see id.* at 7, but Parmley did not receive a federal trademark until March of 2009 and did not even file an application for one until January 3, 2008. *See* USPTO, Trademark Electronic   Search   System:   Sarco   Creek   Ranch,   *available   at*

http://tmsearch.uspto.gov/ (Search term: Sarco Creek Ranch).   Presumably, the original calendars were printed by January of 2007 and 2008 at the latest, so that they could be handed out to potential customers at the beginning of the year.  *See* Docket Entry No. 120-1 at 4 (letter from publishing company suggesting calendars were completed in January).   The Greesons argued that the appearance of the registration symbol on the electronic copies of the calendars "strongly suggests that the calendars produced to the Court are recent fabrications."  Docket Entry No. 121 at 7.[8]

In response to the concerns the Greesons raised, the Court issued a show cause order, instructing Parmley to explain why the 2007 and 2008 calendars were produced long after discovery had ended and to answer questions about the calendars' authenticity.  Docket Entry No. 122 at 2.  The Court also ordered Parmley to submit original hard copies of those calendars to the Court.  *Id.*  He never did so. Instead, he sent the original 2014 and 2015 calendars—neither of which the Court requested.  Docket Entry No. 124 at 1 n.2.  The Court therefore set a show cause hearing and ordered Parmley to bring to the hearing all computers or other electronic media on which the files existed.  Docket Entry No. 124 at 2.

---

[8] The motion also alleged that Parmley had "been fabricating evidence top pay holes in [the] case from the very beginning of this litigation" and included a number of examples.  Docket Entry No. 121 at 7 n.11.

### D.    The Show Cause Hearing: Parmley Says a Corpus Christi Kinko's Scanned the Calendars in 2008

At the show cause hearing, Parmley was asked to explain the origin of the electronic "copies" of the 2007 and 2008 calendars.  Testifying under oath, Parmley stated that he found the 2007 and 2008 calendars on a flash drive right after the summary judgment hearing when he "went through everything [he] had" to search for a 2006 calendar with advertising.  Docket Entry No. 131 at 8.  He claimed that the reason he had not found them earlier during discovery was that he is "not a real organized person" and that he has "never married, and [his] house is full of boxes." *Id.* at 8.  He stated that the actual 2007 and 2008 calendars no longer existed.  *Id.* at 7–8 ("I don't normally keep calendars. I have never known to—never was explained to me to keep ads or anything on this, and so I just trashed them.").  Parmley brought the 8-gigabyte Lexar flash drive to the hearing.

So how were the images on the recently discovered flash drive created in the first place?  Parmley testified that in 2008 he took the original calendars "down to Kinko's in Corpus Christi"—"an hour and 15 minute drive" each way—where the calendars were "scanned" on to the flash drive.  *Id.* at 6–7.  He told the Court that he had the scans made because he "anticipated maybe going to another calendar company" and that he "wanted to get copies" of the originals so as to avoid paying "a setup fee for the advertisement part" when he switched companies.  *Id.* at 5.

12 / 35

Curious as to the details of the story, the Court asked the following questions:

THE COURT: You drove over two hours round trip twice to Kinko's. Why didn't they just do it right when you were there?

MR. PARMLEY: I—they don't—you drop things off, and they—you have to schedule the work with them in the back of their department.

THE COURT: So you don't want to do it yourself at Kinko's?

MR. PARMLEY: I'm—I'm a—I'm a scientist. I'm not a computer person—or a copy person. I don't know—get into that.

*Id.* at 7.  Parmley further testified that he had not noticed in 2008 that the edges of the 2007 and 2008 calendars were cut off in the scan that Kinko's allegedly made. *Id.* at 11–12.[9]  Although the supposed reason for scanning the calendars was that he was considering switching calendar companies, Parmley never sent the copies to another company.  *Id.* at 6.

Defense counsel asked Parmley about whether the calendars were scanned images or composites.  *Id.* at 17.  Although Parmley initially waivered saying "I don't know," when read back the earlier transcript of opposing counsel's questions and asked again by the Court whether or not the images were scans or composites, Parmley stuck to his original story that they were scanned copies of the original calendars that were made by Kinko's:

THE COURT: Are you saying it's possible that this was created with two separate documents?

---

[9] For reference, compare the 2007 and 2008 calendar images, which are square-shaped and missing a border, to the image of the 2006 calendar cover, which is rectangular-shaped and contains a clear border.  *Supra* at pp. 7–8.

MR. PARMLEY: I don't know what Mr. Keeling [opposing counsel] was inferring, sir.

THE COURT: All right. But you're saying you took to Kinko's two full official 2007 and 2008 calendars?

MR. PARMLEY: Yes. And I told them to scan them.

THE COURT:  You didn't give them two different pieces of something and have them combine them?

MR. PARMLEY: No, sir.

*Id.* at 34–35.

Opposing counsel also asked Parmley if 8-gigabyte flash drives were in existence in 2008, and if so, how much it would have cost for such a large flash drive at that time.  *Id.* at 33.  Parmley testified that he did not know, but that his "guess" was that he brought it back with him from Kinko's.  *Id.*  The Court turned the flash drive over to the Greesons in the event they wanted to engage in further investigation.

At the end of the hearing, the Court ruled that the 2007 and 2008 calendars were inadmissible at trial because they were not produced during discovery despite repeated requests for this type of information.  Docket Entry No. 131 at 54.

## E.      The Greesons Request "Death Penalty" Sanctions

That exclusion of the recently produced evidence, along with attorneys' fees, was the relief the Greesons had originally sought in their request for sanctions. Docket Entry No. 121 at 9.  In light of Parmley's testimony at the hearing and an

expert's subsequent review of the flash drive, the Greesons filed a renewed motion seeking dismissal of Plaintiffs' claims and entry of default judgment on Defendants' counterclaims.  Docket Entry No. 127 at 14.  The motion contended that Parmley committed perjury and fabricated evidence.  *Id.* at 5.  It relied on an examination of the flash drive by an expert, Linda Key, who concluded that the documents were not scanned images of an actual calendar but instead composite images pieced together using various images, text, and vectors in a graphics program called CorelDraw.  *Id.* at 2–3.

The Court issued an order allowing Parmley almost a month (25 days) to respond to the Greesons' motion and inform the Court if he desired a hearing to present live testimony, question the Greesons' expert, or present oral argument on the Greesons' motion.  Docket Entry No. 128.  Parmley never requested a hearing. He did, however, file a response, which conceded that the documents were made by "cutting and pasting [] the original images into a file to create a whole image."[10] Docket Entry No. 138 at 6.  But that did not matter, he contended, because the 2007 and 2008 calendars were still admissible under the best evidence rule on the theory that testimony indicated that they are accurate replicas of actual calendars that had advertised Sarco Creek Ranch.  *Id.*  The Greesons replied with information from the flash drive's manufacturer that the device was created between October 26, 2015

---

[10] Parmley did not specify when this recreation occurred.  *See id.*

and November 1, 2015, within two months of the show cause hearing and years after the time when Parmley testified he had the Corpus Christi Kinko's save the scanned calendars onto the flash drive.  Docket Entry No. 135 at 3; Docket Entry No. 131 at 32–35.

## II.   THE COURT'S SANCTIONS AUTHORITY

Rule 37(b) of the Federal Rules gives courts broad power to impose sanctions for "fail[ing] to obey an order to provide or permit discovery."  FED. R. CIV. P. 37(b)(2)(A); *see also Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*, 685 F.3d 486, 488–89 (5th Cir. 2012).   Sanctions under the Rule include any remedies necessary to deter the misconduct, and can be as severe as dismissal of a case.  *Smith & Fuller*, 685 F.3d at 488.  Although some of Parmley's conduct, such as failing to produce the 2007 and 2008 calendars during discovery was undoubtedly a discovery violation, Parmley's most egregious conduct—fabrication of evidence and perjury— does not squarely fit into the discovery framework.

The Court also has inherent power to impose sanctions when other rules do not provide an adequate remedy.  *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991) ("[W]hen there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power. But if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent

power."). Reliance on this inherent authority is appropriate when there is a "wide range of willful conduct" implicating multiple rules, *Woodson v. Surgitek, Inc.*, 57 F.3d 1406, 1418 (5th Cir. 1995), or when the conduct at issue is altogether "beyond the reach of the rules," *Chambers*, 501 U.S. at 51. Using the court's inherent power in such situations promotes efficiency and avoids the needless satellite litigation that would occur if the court had to apply the rules to each discrete occurrence separately before invoking its inherent power. *Woodson*, 57 F.3d at 1418. Because the wide range of conduct at issue in this case does not fall neatly within Rule 37, or any other Rule, the Court will apply the inherent powers framework. That inures to Parmley's benefit in one sense: as detailed below, the burden for imposing sanctions under a court's inherent powers is higher than for sanctions under specific rules.

Under its inherent power to sanction, the Court may dismiss a case (when the plaintiff has engaged in sanctionable conduct) or impose default judgment (when the defendant has engaged in sanctionable conduct) when necessary to deter "bad faith or willful abuse of the judicial process." *Woodson*, 57 F.3d at 1417 (internal quotation marks and citation omitted); *see also Pressey v. Patterson*, 898 F.2d 1018, 1021 n.2 (5th Cir. 1990) (stating that sanctions of default judgment and dismissal with prejudice are viewed "interchangeably" in this circuit); *Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598, 614 (S.D. Tex. 2010) ("As a general rule, in this circuit, the severe sanctions of granting default judgment, striking

pleadings, or giving adverse inference instructions may not be imposed unless there is evidence of "'bad faith.'") (citing cases).  Bad faith and willful abuse have been found when a party or its counsel maintains patently unreasonable litigation positions or engages in contumacious behavior that deliberately subverts a court's administration of a case.  *See Brown v. Oil States Skagit Smatco*, 664 F.3d 71, 76–80 (5th Cir. 2011) (affirming dismissal for perjury during deposition testimony); *Woodson*, 57 F.3d at 1417 (affirming death penalty sanctions under the court's inherent power when plaintiff's counsel tried to enforce settlement agreement despite refusing to have client take test that was a condition of the settlement and when counsel filed a mandamus petition for the purpose of creating additional procedural delay).  But given the extreme nature of the dismissal sanction, courts should impose it reluctantly, only when lesser sanctions are insufficient.  *See Brown*, 664 F.3d at 77.  And the burden for imposing sanctions under the court's inherent power is higher than those under Rule 37 or other sources.  It requires a finding of bad faith, *see Chambers*, 501 U.S. at 50, and arguably a "clear and convincing evidence" burden of proof, which is the burden this Court will apply in its analysis. *See White v. Reg'l Adjustment Bureau, Inc.*, No. 15-10723, 2016 WL 373322, at *2 n.1 (5th Cir. Jan. 29, 2016) (suggesting that the higher burden of clear and convincing evidence is not always required); *In re Moore*, 739 F.3d 724, 730 (5th Cir. 2014) (reviewing for clear and convincing evidence a bankruptcy court's

decision to dismiss an adversary proceeding under its inherent power to sanction); *Operaciones Tecnicas Marinas S.A.S. v. Diversified Marine Servs., LLC*, No. CIV.A. 12-1979, 2015 WL 5098631, at *2 (E.D. La. Aug. 31, 2015) (applying clear and convincing evidence standard under the court's inherent power to sanction).

Courts are especially reluctant to impose the extreme sanction of dismissal on a blameless party based on counsel's misconduct. *See, e.g.*, *Brown*, 664 F.3d at 77; *Woodson*, 57 F.3d at 1418; *Silas v. Sears, Roebuck & Co.*, 586 F.2d 382, 385 (5th Cir. 1978). This concern is not present when the party directly engaged in the alleged misconduct as is the case with perjury. For example, the Fifth Circuit upheld dismissal of a case when a plaintiff committed perjury on the grounds that "perjury [is] a serious offense that constitutes a severe affront to the courts and thwarts the administration of justice." *Brown*, 664 F.3d at 80; *see also Tesco Corp. v. Weatherford Int'l, Inc.*, No. CIV.A. H-08-2531, 2014 WL 4244215, at *6–7 (S.D. Tex. Aug. 25, 2014) (imposing death penalty sanctions under the court's inherent power when a lawyer lied to the court about a witness's out-of-court testimony in order to gain an unfair advantage during litigation), *appeal dismissed sub nom. Tesco Corp. v. Nat'l Oilwell Varco, L.P.*, 804 F.3d 1367 (Fed. Cir. 2015).

## III.  THE COURT'S FINDINGS: PARMLEY ENGAGED IN SERIOUS AND HABITUAL MISCONDUCT

Clear and convincing evidence establishes that Parmley engaged not just in that "serious offense" of perjury, but also in the equally reprehensible act of

knowingly submitting fabricated evidence.

Indeed, although Parmley has not apologized or acknowledged in any way the seriousness of his conduct, it is now essentially undisputed that Parmley both 1) lied during the show cause hearing and 2) submitted fabricated evidence.  The same evidence establishes both forms of egregious misconduct because the lie is his claim that the exhibits were scans of actual calendars he presented to Kinko's.  Parmley does not dispute the conclusion reached by the Greesons' expert, Linda Key, that the scanned images of the 2007 and 2008 calendars were a "cut and paste composite." Quite the opposite, he now readily acknowledges that the images are "composite[s]" created by "cutting and pasting . . . original images into a file to create a whole image."  Docket Entry No. 138 at 6–7.  He even offers a witness, Jeanne Byerly, who states that she had made the images using "CorelDraw" at Parmley's request for "historical purposes."[11]  (More on the Byerly statement later.)  Docket Entry No. 138-7 at ¶ 2.

So what is his defense?  That it was permissible to use these acknowledged composites (he doesn't say when and where they were created) because they recreated calendars that actually existed years ago.  *See* Docket Entry No. 138 at 6 ("The cutting and pasting of the original images into a file to create the whole image

---

[11] It's not clear from the briefing or Byerly's affidavit what connection she has to this case or to Parmley.  *See* Docket Entry No. 138-7.

is within the best evidence rule and is not a fabrication of evidence as long as the resulting image is a true and correct copy.").  Of course, that astonishing contention—which probably doesn't even merit a response, though the Court will make one below—is a recognition that Parmley's detailed testimony about taking the calendars to get scanned at a Corpus Christi Kinko's in 2008 is false.

Although Parmley's indirect admission makes it unnecessary, the Court will highlight some of the evidence that overwhelmingly establishes that the exhibits submitted to the Court were not scans of actual calendars and thus that Parmley lied at the show cause hearing and submitted fabricated evidence.

The Court finds the affidavit of Linda Key credible, persuasive, and alone sufficient to establish both the perjury and submission of fabricated evidence. Among her detailed forensic analysis which led to the conclusion that the images were not scans of actual calendars but instead composites of multiple images are the following highlights:

- The document properties show that the electronic calendars were created by someone named "Jeanne" in CorelDraw, which is a graphics program, not a scanning program, and then exported as PDFs; the source document for the electronic calendars has a ".cdr" file extension that is unique to CorelDraw.  Docket Entry No. 127-5 at ¶ 4.

- The content of the documents also shows that they are composite images containing scanned images, text, and graphical elements, rather than just scanned images.  Whereas the words "2007," "2008," and "Collector's Calendar" are part of an original low-quality, scanned image, the phrase "Sarco Creek Ranch" is a separate textual element. Similarly, the registered trademark symbol, ®, and the two squiggly

lines to the left of "Sarco Creek Ranch" are graphical elements called vectors and not part of any scanned image. *Id.* at ¶ 5.

- Although some optical character recognition (OCR) programs can detect words within an image being scanned and replace the image of those words with editable text, no such program was used here because the words do not zoom in and out cleanly as they would if an OCR program had been used. *Id.* at ¶ 6.

- The pixilation shows that the main photo on each electronic calendar page was scanned, cropped, and then placed on the page in Corel Draw. This means that everything outside the cropped area in the PDF was added subsequently in CorelDraw and is not part of the original scanned image. *Id.* at ¶ 8.

The combining of various images, text, and vectors that Key uncovered would have been remarkably easy. As discussed above, Parmley had the post-registration 2014 calendar with the Sarco Creek Ranch ad at the bottom. And Dos Amigos keeps images of the Mexican Heritage calendars dating back to 2000. *See* THE ORIGINAL MEXICAN HERITAGE COLLECTOR'S CALENDAR, http://mexicanrevolution calendar.com (last visited February 6, 2016).

There is more. The expert report of forensic examiner Roy Rector also provides clear and convincing, indeed again uncontroverted, evidence that the calendar files were not scans created in 2008 as Parmley testified. Rector's affidavit, which the Court finds credible, establishes that someone backdated the PDF calendar files to cover up the fact that those files were created during fall 2015—*after* the Court inquired about whether there was a copy of the 2006 calendar with a Sarco Creek advertisement. The metadata of the files shows creation dates using Adobe

of September 18, 2008—consistent with Parmley's story about having the calendars scanned at the Corpus Kinko's in 2008.  As Rector explains, such dates are easily manipulated—even an unsophisticated user can just change the date on the computer's calendar before creating the file.  Docket Entry No. 132-1 at ¶ 8.  But other facts Rector uncovered demonstrate the falsity of those 2008 creation dates. First, those 2008 dates are stored in the metadata section of Adobe XMP Core 5.2, which itself was not released until two years later on September 27, 2010.  *Id*. ¶ 7. Second, the file properties indicate that Adobe Distiller 10.1.16 was used to create the files.  *Id*.  That update to Adobe was not released until October 13, 2015.  *Id.* Finally, Rector's examination of the flash drive revealed another act of obstruction by Parmley: although the Court's show cause order directed that any computer files not be accessed between the issuance of the order and the hearing (precisely to prevent manipulation of the data once Parmley had notice that the files would be scrutinized), a hidden system artifact shows that the flash drive was accessed on December 7, 2015 at 11:53 a.m.  *Id*. ¶ 6.  That was the morning before the show cause hearing.

All this is more than enough to support the conclusion that Parmley committed perjury and knowingly submitted fabricated evidence.  It also refutes the affidavit of Jeanne Byerly, which the Court finds not credible.  Byerly—whose name never came up at the show cause hearing when Parmley told the Kinko's story—says she used

CorelDraw to create the calendar exhibits through a combination of actual scans, vector art, and text. *See* Docket Entry No. 138-7 at ¶ 2. She contends that Parmley gave her the actual calendars but they could not be scanned because of their "size," which led to the use of CorelDraw. *Id.* Parmley admitted, however, that he has not had the actual calendars (assuming they ever existed) for many years. *See* Docket Entry No. 131 at 6–8. That means Byerly's creation using the original calendars would have happened, if it all, many years ago. But Rector's testimony shows that the Adobe program used to save the files was not on the market until October 2015. Aside from his testimony, if Parmley did have the actual calendars in October 2015, he would have had every incentive to submit them to the Court when requested. Finally, Byerly's affidavit is conclusory and vague: she does not say why Parmley contacted her, what experience she has with graphic design, where she lives or works, and states that she "does not recollect the exact date" when she made the images and does not even include a general time frame. *See* Docket Entry No. 138-7.

But an even more straightforward path to these same conclusions comes from the information provided by Lexar, the manufacturer of the flash drive. The suspicions the Greesons' counsel raised about the use of an 8 gigabyte flash drive in 2008—it would have been quite expensive at the time for storing such small files— proved prescient. The flash drive didn't roll off the Lexar assembly line until the

end of October 2015.  Docket Entry No. 135-4 at 1.[12]  Tellingly, that is less than a

month before Parmley submitted the 2007 and 2008 calendar "scans" that were

saved on the flash drive.  Docket Entry Nos. 120-3, 120-6 (filed November 25,

2015).  The obvious conclusion to be drawn from this is that Parmley purchased the

flash drive after the summary judgment hearing and then had the composite images

of the calendars created.

      Given this overwhelming evidence establishing that the exhibits were not

scans of original calendars made in 2008 but instead composite images manipulated

using a graphic design program to recreate the calendars in 2015, it is not surprising

that Parmley tries to divert the issue away from his misconduct.  His primary

response is that his lies and submission of fabricated exhibits are not material

---

[12] Parmley did not object to the email from Lexar, *see* Docket Entry Nos. 138, 139, 141, so any challenge to its admissibility is forfeited.  *See, e.g.*, *Guerrero v. Total Renal Care, Inc.*, 932 F. Supp. 2d 769, 777 (W.D. Tex. 2013) (determining that plaintiff's challenge to hearsay was waived for purposes of defendant's summary judgment motion when not raised in plaintiff's initial motion to strike evidence) (quoting *United States v. Everett*, 237 F.3d 631 n.7 (5th Cir. 2000) ("Hearsay admitted without objection is to be considered and given its natural probative effect as if it were in law admissible.") (internal citations and quotations omitted)).  But to the extent there are questions about the admissibility of the Lexar email, the Court notes that it would admit the email under the residual hearsay exception found in Federal Rule of Evidence 807.  This evidence has circumstantial guarantees of trustworthiness because it came from a neutral third-party without any knowledge of the dispute or any incentive to lie.  *See Alexander v. F.B.I.*, 198 F.R.D. 306, 320 (D.D.C. 2000) (finding a "strong indicia of reliability and trustworthiness" when the declarant had "a lack of incentive to lie").  In any event, as stated above, the Lexar information is not necessary for the Court's conclusions that Parmley lied and knowingly submitted fabricated evidence. The undisputed testimony of Key and Rector are sufficient on their own, and certainly when viewed together.  Moreover, as discussed above, Parmley now effectively concedes that his testimony about the Kinko's origin of the calendars was false and that the exhibits are not scans of actual calendars.

because he offers testimony that calendars like that did exist in 2007 and 2008.[13] This first begs the question why he didn't just take this position at the show cause hearing.  Instead, Parmley concocted an elaborate lie at a hearing the Court set because it already had suspicions about his conduct.  If his recreations are admissible as he argues, why take the risk of lying in court and also engage in a cover up by backdating the creation dates on the files?

The answer is that Parmley knew the importance of questions the Court had raised about the origin and authenticity of the exhibits.  The whole purpose of the show cause hearing was to determine whether the scans were of actual calendars. That's why, prior to the hearing, the Court ordered the submission of the *original calendars*.  Why was this issue important to the Court?  With the advent of electronic court filing, just about every exhibit the Court receives in connection with a motion is a scan of the document.  The assumption is that the scan is either of the original document or a copy of the original.  The Court would have made that same assumption for the 2007 and 2008 calendars but for the Greesons pointing out the lack of previous disclosure and premature registration.

Parmley's position that a party can submit recreations of "lost" documents so long as witnesses say the document previously existed is preposterous.  *See* Mark

---

[13] Parmley does not dispute that the calendars were themselves material because of the important issue of advertising discussed above.

Wilson, *How to Lose a $1.4 Billion Lawsuit: Fabricate Evidence*, FINDLAW,

http://blogs.findlaw.com/in_house/2015/02/how-to-lose-a-14-billion-lawsuit-

fabricate-evidence.html (last visited February 16, 2016) (lawsuit dismissed when

previously lost evidence—a 2004 slideshow alleged to contain trade secrets—was

suddenly found and produced, but turned out to be fabricated evidence from 2012 or

later, not 2004).  It would certainly transform litigation.  Many trial lawyers can

recall cases in which they wish they had an email or contract that their client swears

had existed but is no longer available.  This is especially true in the digital age when

critical emails or other electronic data may be deleted long before a party realizes

their importance.

That would no longer be a problem under Parmley's rule.  Just recreate that

missing email using a graphic design program!  If the law allows such recreations,

it's time to buy stock in companies that produce paper shredders.  A party

anticipating litigation can just destroy all its documents and then recreate them to

their liking.  According to Parmley, as long as a witness says they are accurate

replicas of the prior documents, they are admissible.

Of course, that is not the law.  A party or witness may certainly testify about

a document that no longer exists.  But as that testimony is easily impeached in many

cases, actually producing the document provides important corroboration.  The

evidentiary rule invoked by Parmley permits copies—not recreations—in lieu of an

original writing only when there is no genuine question as to the writing's authenticity. *See* FED. R. EVID. 1003. And even if images of the 2007 and 2008 calendars Parmley produced were copies rather than recreations, they likely would not have been admissible given the substantial question about the registered trademark appearing on the calendars prior to the actual registration.

The other requirements for imposing the requested sanctions are easily satisfied. Engaging in this conduct necessarily involved bad faith. The very definition of perjury excludes negligent conduct. And Parmley's lying occurred at a show cause hearing scheduled because the court already had serious concerns about whether exhibits had been fabricated. The submission of the fabricated exhibits could not have been based on an innocent misunderstanding about the scope of the best evidence rule. If that were the case, there would have been no reason to lie about the exhibits being copies of originals or the need to backdate the files to show a 2008 creation date.

The conduct is attributable to Parmley. The testimony is his own. Whoever created the files, Parmley was involved. At the hearing, Parmley took responsibility for possessing the flash drive. He never said he obtained it from his lawyer. Even the discredited Byerly affidavit says that she made the files at the request of Parmley. And the submission of the fabricated evidence is inextricably intertwined with the perjury. Clear and convincing evidence thus demonstrates that Parmley was

involved in fabricating the 2007 and 2008 calendar exhibits after the summary judgment hearing. He certainly knew that the exhibits of the 2007 and 2008 calendars were not copies of actual calendars.

Finally, lesser sanctions are not a sufficient response to Parmley's conduct. His failure to disclose the supposed 2007 and 2008 calendars resulted in the Court ruling them inadmissible. But the far more serious offenses of submitting fabricated exhibits and lying to the Court warrant greater punishment. Parmley's serious and habitual misconduct demonstrates that he has no regard for this Court's authority or the integrity of the judicial process and that he will stop at nothing to win this case. The extraordinary sanction of dismissal on the claims Parmley asserted and entry of default judgment on the claims brought against him is necessary. *See Brown v. Oil States Skagit Smatco*, 664 F.3d 71, 78–79 (5th Cir. 2011) (approving district court's explicit finding that "dismissal of the complaint in its entirety was the only effective sanction" in case where plaintiff committed perjury to further his own interests in litigation); *Tesco Corp. v. Weatherford Int'l*, Inc., 2014 WL 4244215, at *6–7 (S.D. Tex. Aug. 25, 2014) *appeal dismissed sub nom. Tesco Corp. v. Nat'l Oilwell Varco, L.P.*, 804 F.3d 1367 (Fed. Cir. 2015) (imposing death penalty sanction under the court's inherent power after a lawyer lied to the court because "such an affront . . . can only be answered with dismissal"); *Shangold v. Walt Disney Co.*, 2006 WL 71672, at *5 (S.D.N.Y. Jan. 12, 2006) (imposing death penalty sanctions under the

court's inherent power when plaintiffs "fabricated evidence" that went to the heart of the dispute and then "sought to conceal it"); *Cerruti 1881 S.A. v. Cerruti, Inc.*, 169 F.R.D. 573, 582–83 (S.D.N.Y. 1996) (entering judgment under the court's inherent power against a party who fabricated evidence to show bona fide use in trademark case); *Vargas v. Peltz*, 901 F. Supp. 1572, 1581–82 (S.D. Fla. 1995) (dismissing plaintiff's sexual harassment case because she and her husband had fabricated evidence, committed perjury, and obstructed discovery).

## IV.   ATTORNEYS' FEES

Parmley's abuse of the litigation process has imposed substantial burdens on the Greesons including attorneys' fees and the costs of hiring experts to prove Parmley's malfeasance.  The Court therefore concludes that the Greesons are entitled to their requested attorneys' fees and costs spent investigating and litigating Parmley's misconduct concerning the 2007 and 2008 calendars.  *See, e.g.*, *NASCO, Inc. v. Calcasieu Television & Radio, Inc.*, 894 F.2d 696, 706 (5th Cir. 1990) *aff'd sub nom. Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991) (affirming the district court's imposition of attorney's fees under its inherent power when plaintiff litigated in bad faith and produced fraudulent testimony to the court); *Shangold*, 2006 WL 71672, at *5–6 (imposing death penalty sanctions *and* awarding attorneys' fees under the court's inherent power where plaintiffs fabricated evidence); *Tesco*, 2014 WL 4244215, at *7 (recognizing that in cases of perjury a court may still "award

attorney[s'] fees as a sanction in addition to [] dismissal"). The Greesons should submit a finalized fee request for these costs within ten days of entry of this order that accounts for amounts incurred since the last filing.

## V. CONDUCT OF PARMLEY'S COUNSEL

As has been discussed, the perjury and knowing production of fabricated evidence are directly attributable to Parmley. But separate misconduct by his attorney, Delphine James, should not go unmentioned.

First, when the Court began issuing orders related to the doubts the Greesons raised about the calendars' authenticity, James defied the Court's orders and used her responses to instead reargue the merits of the commercial use issue. For example, when the Court issued an order to show cause requiring the submission of originals of the 2007 and 2008 calendars, she submitted the 2014 and 2015 calendars. She also filed a response that rehashed all of the arguments that had been made about advertising "since [the] 1960s." Docket Entry No. 123, at 2-5. In doing so, she tried to transform what should have been a defensive filing responding to concerns about fabricated evidence into an affirmative opportunity to relitigate the summary judgment motion.

It gets a lot worse. Once forensic analysis of the flash drive made clear that Parmley had lied about scanning original calendars at Kinko's in 2008, James had a duty to withdraw the evidence and correct the testimony (and/or withdraw from the

representation, which many lawyers would have done in these circumstances). *See* Tex. R. Prof. Conduct. § 3.03(b) ("If a lawyer has offered material evidence and comes to know if its falsity, the lawyer shall make a good faith effort to persuade the client to authority the lawyer to correct or withdraw the false evidence. If such efforts are unsuccessful, the lawyer shall take reasonable remedial measures, including disclosure of the true facts."); *see id.* § 3.03 comment 8 "Past False Evidence" ("When a lawyer learns that the lawyer's services have been improperly utilized in a civil case to present false testimony or other material into evidence, the rule generally recognized is that a lawyer must disclose the existence of the deception to the court or to the other party, if necessary to rectify the deception.").

Instead, James filed a response that belittled the importance of her duty of candor to the Court. The brief brushed aside concerns about perjury by arguing that any lies did not matter because the rules of evidence allow introduction of documents that are recreations—thereby sidestepping the issue that the recreations were not denoted as such and passed off to the Court and opposing counsel as copies of originals. As explained above, this argument based on the best evidence rule is patently frivolous. It violates Rule 11, which provides that a court filing constitutes a representation by the lawyer that any legal argument is "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law, or for establishing new law." Fed. R. Civ. P. 11(b)(2). Any such Rule 11 violation

is a serious matter.  The context in which this frivolous argument was asserted—in response to serious concerns about perjury and submission of fabricated evidence—makes it even more so.  Perhaps most troubling, by continuing to press for the admissibility of evidence (the 2007 and 2008 calendars) that undisputed forensic evidence had by then revealed to be fabricated, James herself arguably became complicit in the presentation of false evidence.  Tex. R. Prof. Conduct. § 3.03(a)(5) ("A lawyer shall not knowingly offer or use evidence that the lawyer knows to be false.").

The final straw was that James filed a retaliatory motion for Rule 11 sanctions against the Greesons that was itself frivolous.  Docket Entry No. 139.  The motion first alleges numerous "inconsistencies" from Milton Greeson's deposition, which was taken long before the motion was filed in January 2016.  It then contends that these inconsistencies show the weakness of the Greesons' case and thus demonstrates that the Greesons are using "a frivolous motion for sanctions to circumvent their liability in trial."  Parmley's motion for sanctions goes on to say that the Greesons alleged "fabrication of material evidence without any supporting basis in fact or law."  *Id*. at 5.  So much for the reports of two forensic experts and the information from Lexar about the date of manufacture.  Although difficult to decipher, the motion for sanctions Ms. James filed also appears to rely on her frivolous argument that recreations of documents are admissible under the best

evidence rule.  *Id.*  ("Their expert never testified that the composite file could not have [been] created from multiple computer generated images from the original calendar in violation of the federal rules of evidence.").

A lawyer's duty to both zealously advocate for her client and display candor toward the tribunal can lead to some difficult ethical dilemmas.  This was not one such close call.  James's conduct after learning about the fabrication of the calendars, which also established that her client had lied to the court, went way past the line onto the side in which zealous advocacy should have given way to the duty of candor.

Given the sanctions imposed based on Parmley's conduct alone, the Court will not impose any additional sanctions for James's conduct at this time.  The Court will continue to consider appropriate methods for addressing her independent misconduct.

* * *

The civil justice system serves a vital function in our society.  While far from perfect, it is the best method humankind has ever devised for determining the truth.  When the system is abused as it was by Parmley in this case, the risk is not just that the truth will be distorted in a single case—itself a dire result.  The even graver consequence is reduced public confidence in the ability of the justice system to

deliver true and fair judgments.  As a result, the sanctions for such conduct must be severe.

For these reasons, the Greesons' motion to dismiss Plaintiffs' remaining claims for trademark infringement, tradename infringement, trade dress infringement, unfair competition, and counterfeiting under state and federal law (Docket Entry No. 127) is **GRANTED** and those claims are **DISMISSED WITH PREJUDICE.**  The Greesons' request for a default judgment in their favor cancelling Parmley's trademark registrations for Sarco Creek Ranch under state and federal law (Docket Entry No. 127) is also **GRANTED.**  Defendant's motion to dismiss (Docket Entry No. 142) Parmley's frivolous and retaliatory motion for Rule 11 sanctions is **GRANTED**, and Parmley's motion for sanctions (Docket Entry No. 139) is **DENIED**.

Within ten days the Greesons shall submit a proposed final judgment, along with the supplemental fee request.

SIGNED this 4th day of March, 2016.

_____
Gregg Costa
United States Circuit Judge[*]

---

[*] Sitting by designation